# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF ALABAMA
# NORTHERN DIVISION

MICHAEL L ROSENBERG; HEIDI )
M. CHRISTIE; T.H. TAYLOR, INC. )
and TERRY H. TAYLOR, )
        Plaintiffs, )
         )
        v. ) Civil Action No. 2:16-cv-958-WHA
         ) [WO]
TIG INSURANCE COMPANY, as )
successor by merger to American Safety )
Indemnity Company, a California )
corporation, )
        Defendant. )

## MEMORANDUM OPINION AND ORDER

## I. INTRODUCTION

This cause is before the court on a Motion for Summary Judgment (Doc. #18) filed by Defendant TIG Insurance Company, as successor by merger to American Safety Indemnity Company ("TIG"), together with supporting and opposing briefs and exhibits.

After winning an arbitration award against Plaintiffs T.H. Taylor, Inc. and Terry H. Taylor (collectively, "Taylor"), Plaintiffs Michael L. Rosenberg and Heidi M. Christie ("Homeowners") filed a complaint in this court on December 12, 2016 to recover their award from TIG, Taylor's liability coverage provider. (Doc. #1). In the complaint, the Homeowners seek to recover $1 million from TIG via Ala. Code § 27-23-2, a statutory provision that permits creditors like the Homeowners to recover against insurance providers when they have a judgment against an insured. (Doc. #9).[1]

On September 5, 2017, TIG moved for summary judgment, arguing that Taylor's actions

---

[1] Homeowners amended their complaint to update Defendant's name to TIG after being informed by counsel of the correct name. (Doc. #9 at 1 n.1).

1

were not covered under the policy because they did not constitute an "occurrence" within the terms of the policy, and alternatively, that any damages suffered by the Homeowners were not covered damages within the meaning of the insurance policy. (Doc. #19). For reasons to be discussed, the Motion for Summary Judgment is due to be GRANTED.

## II. SUMMARY JUDGMENT STANDARD

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is proper if "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion," relying on submissions "which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323. Once the moving party has met its burden, the nonmoving party must "go beyond the pleadings" and show that there is a genuine issue for trial. *Id.* at 324.

Both the party "asserting that a fact cannot be," and a party asserting that a fact is genuinely disputed, must support their assertions by "citing to particular parts of materials in the record," or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56 (c)(1)(A), (B). Acceptable materials under Rule 56(c)(1)(A) include "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."

To avoid summary judgment, the nonmoving party "must do more than show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio*

*Corp.*, 475 U.S. 574, 586 (1986). On the other hand, the evidence of the nonmovant must be believed and all justifiable inferences must be drawn in its favor. *See Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986).

After the nonmoving party has responded to the motion for summary judgment, the court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).

### III. FACTS

The submissions of the parties establish the following facts, construed in a light most favorable to the Homeowners:

#### A. The Underlying Dispute and Arbitration

In December 2007, Taylor entered into an agreement with the Homeowners to build a house in Montgomery, Alabama for $756,099.00, and the Homeowners entered into a loan agreement with Regions Bank to borrow $805,400.00 to build the house. (Doc. #9 at ¶¶11-12). In accordance with the terms of the construction agreement, Taylor received periodic payments (or disbursements) from the bank to finance the construction of the house. (Doc. #11-12). When collecting disbursements to finance the construction, Taylor agreed that "the proceeds of the requested advance will be used to pay the bills currently due and for no other purposes." (Doc. #12).

Unfortunately, the Homeowners' house was never completed as Taylor's business suffered from a stagnant economy. Three unpaid materialmen filed suits in state court against Taylor and the Homeowners, and the Homeowners filed a crossclaim against Taylor. *See Am. Safety Indem. Co. v. T.H. Taylor, Inc.*, 513 F. App'x 807, 810 (11th Cir. 2013) [hereinafter *ASIC II*]. The Homeowners subsequently filed an arbitration complaint against Taylor on February 23,

2010, seeking $2 million in damages. (Doc. #20-3). The claims were presented for arbitration on April 23, 2014, and the arbitrator issued a decision on March 24, 2015. (Doc. #24).

In reviewing the financial documentation related to the disbursements, the arbitrator found that by October 15, 2008, Regions had paid Taylor approximately 90% of the loan amount, even though the construction was only 78.5% completed. (Doc. #20-4 at 3). In total, Regions advanced to Taylor $96,657.00 for work that was never completed. (Doc. #20-4 at 6). The arbitrator described the arrangement in the following way:

> It is clear from the analysis that [Taylor was] claiming disbursements far in excess of work performed. It is also clear that Regions was aware, or should have been aware, that [Taylor was] receiving reimbursements far in excess of work completion. It is clear from the draws made by [Taylor] and the inspection made by Regions that Regions had to be, or should have been, aware that the contract was not being performed in an expeditious manner.

(Doc. #20-4 at 7). Though the arbitrator emphasizes Regions's (a nonparty) culpability for its role in this arrangement, it is silent as to Taylor's degree of fault. Instead, it concludes that Taylor's "old acceptable methods of making draws that previously worked, just did not work any longer. As a result, [Taylor] overdrew from [Homeowners'] loan and did not have the funds to finish [Homeowners'] house." (Doc. #20-4 at 4).

The arbitrator then outlined both physical and financial difficulties suffered by the Homeowners as a result of Taylor's failure to complete the construction. Specifically, the arbitrator found that the Homeowners suffered "emotional and mental anguish," as Plaintiff Christie's medications for depression, anxiety, and high blood pressure were increased and Plaintiff Rosenberg suffered a reaction to Lyme disease brought on by the stress of the failed construction. (Doc. #20-4 at 8). Finally, the arbitrator noted financial damages in the form of the Homeowners' responsibility for the construction loan payment, the damage to their credit rating, and their subsequent inability to purchase medical equipment for their business. (Doc.

4

#20-4 at 8).

After finding that Terry Taylor was liable for the debts of his business, the arbitrator succinctly stated: "Based upon the evidence and testimony presented, I find for the Plaintiffs and against the Defendants, jointly and severely,[2] in the amount of $1,762,198.00. All costs of the arbitration are to be taxed to Defendants." (Doc. #20-4 at 8). In the instant suit, the homeowners now seek to satisfy a portion[3] of this judgment from TIG, Taylor's liability insurance coverage provider.

### B. Taylor's Liability Insurance Policy and the Duty to Defend Litigation

Taylor and TIG's predecessor, American Safety Indemnity Company, entered into a Commercial General Liability Policy on April 18, 2008. (Doc. #20-15). The agreement provides that TIG had a duty to defend and indemnify Taylor for damages sustained under the contract, and by its own terms, the policy "applies to 'bodily injury' and 'property damage' only if: (1) The 'bodily injury' or 'property damage' is caused by an 'occurrence' that takes place in the 'coverage territory.'" (Doc. #20-15 at 6). The policy defines "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." (Doc. #20-15 at 19). It defines "bodily injury" as "bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time." (Doc. #20-15 at 17).

While the lawsuits relating to unpaid materialmen were pending against Taylor and after the Homeowners filed an arbitration complaint against Taylor, TIG filed a declaratory judgment action in the Middle District of Alabama asking the court to declare that it had neither a duty to defend in the arbitration nor a duty to indemnify Taylor for any liability to the Homeowners. *Am. Safety Indem. Co. v. T.H. Taylor, Inc.*, No. 2:10CV48-MHT, 2011 WL 1188433, (M.D. Ala.

---

[2] This court assumes that the arbitrator refers here to joint and *several* liability.
[3] The policy limit per occurrence is $1 million. (Doc. #20-15 at 5).

5

Mar. 29, 2011) (Thompson, J) [Hereinafter *ASIC I*]. The court found—and the Eleventh Circuit affirmed—that TIG did not have a duty to defend Taylor in the arbitration proceedings, though it declined to decide the indemnity issue because it was not yet ripe for review. *ASIC II* at 810 n.4. Accordingly, TIG declined to defend Taylor at the arbitration proceeding. Following the arbitration proceeding, the Circuit Court for Montgomery County, Alabama entered the arbitration award as a final judgment, and the Homeowners filed the instant suit under Ala. Code § 27-23-2, a statute that permits judgment creditors to sue an insurer to satisfy a judgment against an insured.

## IV. DISCUSSION

Under Alabama law, "[w]hether there is a duty to indemnify under the policy will depend on the facts adduced at the trial," *Hartford Cas. Ins. Co. v. Merchants & Farmers Bank*, 928 So. 2d 1006, 1013 (Ala. 2005), so it is possible for there to be a duty to indemnify when there did not exist a duty to defend. *See also Porterfield v. Audubon Indem. Co.*, 856 So.2d 789, 792 (Ala. 2002) (finding that "the practical difference between [the duty to defend and the duty to indemnify] requires that they be analyzed separately"). This court will examine the legal analysis of the duty to defend in the previous litigation between TIG and Taylor before turning to the new arguments raised in this case to determine if the claim has "evolved" so as to bring Taylor's actions within the scope of the insurance policy's coverage. *See ASIC II* at 814.

### A. The Duty to Defend Litigation

As set forth above, Taylor's insurance policy with TIG covered losses that result from "occurrences," which the policy defines as "accidents." Under Alabama law, an accident is "[a]n unintended and unforeseen injurious occurrence; something that does not occur in the usual course of events or that could be reasonably anticipated." *Hartford*, 928 So.2d at 1011 (quoting

6

*Black's Law Dictionary* 15 (7th ed. 1999)). In *ASIC I*, the court found that Taylor's actions did not constitute an occurrence under Alabama law.

First, the court in *ASIC I* found that TIG had no duty to defend in the preceding litigation involving the suits with materialmen and the crossclaim between Taylor and the Homeowners that eventually prompted the arbitration proceeding:

> "The word 'accident,' in accident policies, means an event which takes place without one's foresight or expectation. A result, though unexpected, is not an accident; the means or cause must be accidental." *Black's Law Dictionary* (9th Ed.2009) (quoting 1A John Alan Appleman & Jean Appleman, Insurance Law and Practice § 360, at 455 (rev.vol.1981)). According to the allegations made by Rosenberg and Christie, the THT parties'[4] actions cannot be termed accidental. Rosenberg and Christie say that the THT parties represented that their home was nearly complete when in fact it was only 70 % finished. Rosenberg and Christie also allege that, every time the THT parties received an advance on the construction loan, they "warranted 'that all subcontractors or other persons furnishing labor, materials or equipment in the construction of said residence have been paid in full for monies paid to date,'" but that Rosenberg and Christie later learned that several of the subcontractors had not been paid. Rosenberg and Christie further allege that the THT parties "knew such representations were false" when they made them.
>
> There are no allegations set forth in Rosenberg and Christie's crossclaim and third-party claim to support the conclusion that the THT parties were mistaken in their averments that all bills had been paid or that the house was 95% complete. Indeed, the allegations actually controvert any notion of innocent misrepresentation.

*ASIC I* at \*4–5 (citations to record omitted). Because Taylor's actions were intentional, they did not constitute an occurrence within the meaning of the insurance policy and TIG had no duty to defend.

Next, the court applied similar reasoning when holding that TIG also had no duty to defend in the arbitration proceeding. In reviewing the arbitration complaint, the court found that even though the complaint "remov[ed] any characterization of [Taylor's] conduct as intentional,"

---

[4] The "THT parties" refers to Taylor as an individual as well as T.H. Taylor Inc., which this court (and the Eleventh Circuit opinion) refers to collectively as Taylor.

7

the duty to defend still was not triggered because the court was able to look to other admissible facts—namely, the evidence discussed in the context of the duty to defend the preceding litigation—to conclude that Taylor's conduct was intentional. *Id.* at *6. On appeal, the Eleventh Circuit specifically upheld the court's consideration of the state court litigation in determining whether Taylor's actions constituted an occurrence for the purposes of the arbitration complaint. *ASIC II* at 811 ("The matters examined by the district court in this instance consisted of the allegations of the [Homeowners'] cross claims that resulted in the order to arbitrate as well as the claims made by the plaintiffs in the state court litigation, all of which suggested intentional conduct by Taylor. We find no error in taking that approach in the circumstances of this case.").

Finally, the court found that it could not yet rule on TIG's duty to indemnify because there was not yet a ruling as to Taylor's liability to the homeowners. *ASIC I* at *6. The Eleventh Circuit affirmed this finding, and added the following warning: "The duty to indemnify remains undecided, and if it evolves that the claim against Taylor is decided in a way that triggers coverage under the policy at issue, the decision made today will be moot." *ASIC II* at 814.

### B. The Arbitration Decision

The question for the court in this case, then, is whether the claim "evolved" after the complaint in a way that has triggered coverage under the insurance policy. The Homeowners claim that the "discussion and findings as to Taylor's conduct that is contained in the Arbitration Award clearly indicates that TIG is obligated to indemnify Taylor." (Doc. #22 at 6). The Homeowners lay out several reasons why they believe that the arbitration decision describes an occurrence within the meaning of the policy. This court disagrees, and it will address each argument in turn.

First, Homeowners argue from the same basic facts that were presented in the previous

8

litigation (and in the arbitration complaint) that Taylor's actions constituted an "occurrence" and trigger coverage under the policy. With respect to Taylor's action, the Homeowners point to no new facts contained in the arbitration decision; instead, they repeat the legal argument that "the proper inquiry is whether Taylor intended or expected that withdrawing more fund[s] would cause the injury. The definitions are clear that the question is whether the *injury* was intended or expected." (Doc. #22 at 5) (alteration in original). The Homeowners misstate Alabama law on this issue. As explained by the court in *ASIC I*, a "result, though unexpected, is not an accident; the means or cause must be accidental." *ASIC I* at *4 (citations omitted); *see also State Farm & Cas. Co. v. Myrick*, 611 F. Supp. 2d 1287, 1294 (M.D. Ala. 2009) ("The actions were deliberate [and therefore not an accident] even if they were pursued without a wrongful intent."). Nothing in the arbitration award changes any fact that led the court in *ASIC I* to make this finding, and this court too finds that Taylor's actions—making dozens of withdrawals by warranting that the Homeowners' home was more complete than it was and that all subcontractors had been paid in full while actually failing to pay subcontractors—cannot be construed as an accident.

Second, the Homeowners' primary new argument relating to the arbitration award is that the "arbitrator examined Taylor's conduct outside of a vacuum by hearing evidence on the state of the industry." (Doc. #22 at 6). In full, the portion of the arbitration decision that the Homeowners cite reads as follows:

> The evidence presented showed that in 2008, during the periods the Plaintiffs' home was under construction, that new business opportunities for residential homebuilders began to slacken. The evidence showed that the overhead required to continue necessary operations of T.H. Taylor, Inc., as a growing concern, remained, at best, constant. As a result there was an increasing pressure to maintain a cash flow for the business.
>
> As the residential construction downturn continued, it became increasingly difficult for the Defendants to continue paying subcontractors and suppliers, and its business overhead expenses. This was true despite the fact that there was

9

> constant draws from the construction loan made by Regions Bank to the Defendants.
>
> It appears that the dramatic downturn in the economy, generally, and in the homebuilding industry specifically, during this period, was unforeseen and unanticipated, not only by the Defendants, but by American business in general. The old acceptable methods of making draws that previously worked, just did not work any longer. As a result, the Defendants overdrew from the Plaintiffs' loan and did not have the funds to finish Plaintiffs' house.

(Doc. #20-4 at 4). Based on this passage, the Homeowners argue that "the arbitrator acknowledged that Taylor's misrepresentations—'the old acceptable method of making draws'—were innocent or negligent, but not willfully to deceive." (Doc. #22 at 7).

The award makes no such acknowledgement. As pointed out by the Defendants, "if Taylor adhered to an industry custom or practice, then . . . his acts were purposeful and deliberate, as one does not accidently adhere to a custom." (Doc #23 at 7). Moreover, even if Taylor's actions *were* the result of adhering to an industry custom (or simply Taylor's own prior business strategy), such a finding has no bearing on whether those actions constitute an occurrence under Alabama law. The question is whether Taylor's actions were intentional, and nothing in the arbitration award suggests they were not. As stated above, "a result, though unexpected, is not an accident; the means or cause must be accidental." *ASIC I* at *4 (citations omitted).

Finally, this court will emphasize that while the Homeowners claim that the arbitration award "clearly" includes conduct triggered under the insurance policy, the award does not state the grounds on which it makes its decision. Instead, it simply finds "for the Plaintiffs and against the Defendants." (Doc. #20-4 at 8). Because the Homeowners point to no evidence in the arbitration award that Taylor's action were less than intentional, Homeowners' argument fails as a matter of law and the Defendant is entitled to summary judgment.

## C. Covered Damages Under the Policy

Even if this court found that Taylor's actions constituted an occurrence under Alabama law, TIG would still be entitled to summary judgment because the Homeowners point to no evidence that the arbitration award shows what damages would be covered by the policy.

The policy only covered damages for "bodily injury" and "property damage" to which the insurance policy applies. (Doc. #20-15 at 6). "Property damage" is defined as "[p]hysical injury to tangible property" or "[l]oss of use of tangible property that is not physically injured." (Doc. #20-15 at 19, 20). Under Alabama law, economic losses such as bank loans and business losses are not "property damage" within the meaning of this insurance policy. *See Am. States Ins. Co. v. Martin*, 662 So.2d 245, 248-49 (Ala. 1995).

The Homeowners contend that the "damages awarded *all* resulted from and were awarded because of bodily injury." (Doc. #22 at 11) (emphasis added). Because the damages awarded were for bodily injury, the Homeowners argue, they are covered under the policy. However, the Homeowners point to *no* evidence suggesting that all of the damages were for bodily injury. As discussed above, the award itself does not specify what type of damages it awards. (Doc. #20-4 at 8). Moreover, the arbitration decision makes repeated reference to financial damages that the Homeowners suffered, including that "Plaintiff[s] became responsible for the construction loan payment, the credit ratings of the Plaintiffs suffered, and as a result the Plaintiffs were unable to secure credit to purchase medical equipment for use [in] their medical office." (Doc. #20-4 at 8). In fact, the Homeowners claim that the conduct at issue "destroyed them both physically and financially." (Doc. #22 at 4-5). These economic damages would not be covered under Taylor's insurance policy, even if there had been an "occurrence," and the Homeowners point to no evidence to indicate that the arbitration decision does not include

economic damages in its award.

Under Alabama law, the party claiming coverage—in this case, the Homeowners—bears the burden of proving that damages are covered by the insurance agreement. *Ala. Hosp. Ass'n Tr. v. Mut. Assur. Soc. of Ala.*, 538 So.2d 1209 (Ala. 1989). Applying Alabama law, the Eleventh Circuit made clear the proposition that courts cannot retroactively allocate damages to find that some damages are covered under an insurance policy in cases such as this one:

> We cannot discern from the verdict form the amount of damages the jury awarded the Sniders for their injuries caused by Beale's abandonment of the job, as opposed to injuries caused by Beale's faulty work. Alabama courts have held that when (1) the injured party in the underlying action pursues two theories of liability, (2) under one of the theories there is no coverage under the policy, and (3) the jury returned a general verdict, then it is "impossible" to establish coverage under the policy.

*Pennsylvania Nat. Mut. Cas. Ins. Co. v. Snider*, 607 F. App'x 879, 883 (11th Cir. 2015)(citing *Ala. Hosp. Ass'n Tr.*, 538 So.2d at 1216.). Here, Homeowners pursued two different types of damages and received a general verdict, so it is "impossible" for them to now establish coverage under the policy. *Id.* The Homeowners cite no law to distinguish these cases, claiming only that "[t]hese cases are inapplicable here, because all of the damages awarded to [the Homeowners] are covered." (Doc. #22 at 11). Because the Homeowners point to no evidence to support this contention, the Defendant is entitled to summary judgment on this ground as well.

## V. CONCLUSION

For the reasons discussed, it is hereby ORDERED that the Motion for Summary Judgment (Doc. #18) is GRANTED. A separate Final Judgment will be entered in accordance with this Memorandum Opinion and Order.

Done this 12th day of October, 2017.

/s/ W. Harold Albritton
W. HAROLD ALBRITTON
SENIOR UNITED STATES DISTRICT JUDGE